**SOUTHWEST CENTER FOR BIOLOG-ICAL DIVERSITY, a non-profit corporation, Plaintiff,**

v.

**UNITED STATES BUREAU OF RECLA-MATION and Bruce Babbitt, Secretary of the Interior, Defendants.**

No. CIV. 97–0786 PHX EHC.

United States District Court,
D. Arizona.

Aug. 25, 1997.

Eric Robert Glitzenstein, Meyer & Glitzenstein, Washington, DC, Matthew Gilbert Kenna, Kenna & Associates, PC, Durango, CO, Travis Earl Stills, Durango, CO, for Southwest Center for Biological Diversity.

Michael A. Johns, U.S. Attorney's Office, Phoenix, AZ, Lois J. Schiffer, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, Samuel D. Rauch, III, U.S. Dept. of Justice, Environment & Natural Resources, Div., Washington, DC, for U.S. Bureau of Reclamation, Department of the Interior.

Michael Noone McCarty, Brickfield Burchette & Ritts, PC, Washington, DC, James P. Bartlett, Phoenix, AZ, for Arizona Power Authority.

Michael J. Pearce, Arizona Dept. of Water Resources, Legal Div., Phoenix, AZ, for State of Arizona, Rita P. Pearson.

Howard Benjamin Golds, Best Best & Krieger, LLP, Riverside, CA, for Metropolitan Water Dist. of Southern California.

Carol D. Angel, Office of the Atty. Gen., State of Colo., Denver, CO, for State of Colo.

C. Brian James, New Mexico Atty. Gen., Santa Fe, NM, for State of New Mexico.

Michael Mahlon Quealy, Utah Atty. General's Office, Salt Lake City, UT, for State of Utah.

Thomas John Davidson, Wyoming Atty. General's Office, Cheyenne, WY, for State of Wyo.

Gerald Arthur Lopez, Office of the Nevada Atty. Gen., Las Vegas, NV, James H. Davenport, Office of Atty. Gen., State of Nev., Las Vegas, NV, for State of Nevada.

Samuel D. Rauch, III, U.S. Dept. of Justice, Environment & Nat. Resources, Div., Washington, DC, James P. Bartlett, Phoenix, AZ, for Bruce Babbitt.

John Andrew Fritschie, Defenders of Wildlife, Washington, DC, for Defenders of Wildlife.

David E. Lindgren, Downey Brand Seymour & Rohwer, Sacramento, CA, for Southern Nevada Water Authority.

John B. Weldon, Salmon Lewis & Weldon, PLC, Phoenix, AZ, for Salt River Valley Water Users Ass'n, Salt River Project Agricultural Improvement and Power Dist.

Norman D. James, Ryley Carlock & Applewhite PA, Phoenix, AZ, for Central Arizona Water Conservation Dist.

John Pendleton Carter, III, Horton Knox Carter & Foote, El Centro, CA, for Imperial Irrigation District.

Linus Serafeim · Masouredis, California Atty. General's Office, Oakland, CA, for State of Cal.

## ORDER

CARROLL, District Judge.

Pending are the parties' cross-motions for summary judgment. Plaintiff contends that the Secretary of the Interior, Bruce Babbitt, through his designee, the Fish and Wildlife Service ("Service"), has failed to comply with the requirements of the Endangered Species Act, 16 U.S.C. § 1531, *et seq.*, with respect to the Southwestern Willow Flycatcher. The Secretary contends that he is entitled to summary judgment on Plaintiff's claim.[1]

### I. Overview of the Endangered Species Act

The Endangered Species Act, 16 U.S.C. § 1531, *et seq.*, (hereafter "ESA") makes it unlawful for any person, including a federal agency, to "take" listed endangered species, except under certain circumstances. 16 U.S.C. § 1538(a)(1)(B). The term "take" is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct. 16 U.S.C. § 1532(19). "Harm" under the statute includes degradation or destruction of an endangered species' habitat. 16 U.S.C. § 1538(a)(1)(B).[2] *See Babbitt v. Sweet Home*

---

1. For the purposes of this order, the Secretary and the Fish and Wildlife Service are used interchangeably with respect to the Secretary's responsibilities under the Endangered Species Act.

2. The ESA also provides for the designation of

*Chapter of Communities for a Great Oregon,* 515 U.S. 687, 115 S.Ct. 2407, 2412, 132 L.Ed.2d 597 (1995); *Palila v. Hawaii Dept. of Land and Natural Resources,* 852 F.2d 1106, 1108 (9th Cir.1988).

If a federal action may jeopardize a listed species, the federal agency involved must prepare a "biological assessment" identifying listed and proposed listed species and their designated or proposed critical habitat in the action area.[3] *See* 50 C.F.R. § 402.02 (1996). The agency must also evaluate the potential effects of the action on the species and habitat. *Id.* If the agency concludes that agency action will adversely affect listed or proposed listed species or their habitat, the agency must initiate consultation with the Service. *See* 50 C.F.R. § 402.02 (1996).

Consultation with the Service by a federal agency "shall ... insure that any action authorized, funded, or carried out ... is not likely to jeopardize the continued existence of any endangered species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the [Endangered Species Committee]."[4] 16 U.S.C. § 1536(a)(2) (emphasis added). A federal action jeopardizes the continued existence of an endangered species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild

by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (1996).

Following formal consultation, the Secretary shall provide a written statement to the federal agency. This "written statement" is commonly known as a "biological opinion." 50 C.F.R. § 402.02 (1996).

In a biological opinion, the Secretary shall: [set] forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. **If jeopardy ... is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate [§ 1536(a)(2)] and can be taken by the Federal agency ... in implementing the agency action.** 16 U.S.C. § 1536(b)(3)(A) (emphasis added). "Reasonable and prudent alternatives" are: alternative actions identified during formal consultation that can be implemented in a manner **consistent with the intended purpose of the action,** that can be implemented **consistent with the scope of the Federal agency's authority and jurisdiction,** that is **economically and technologically feasible,** and that the [Service] believes **will avoid the likelihood of jeopardizing the continued existence of listed species....** 50 C.F.R. § 402.02 (1996) (emphasis added).

Where the Service concludes that a federal action or the implementation of any reason-

---

"critical habitat" of endangered or threatened species. 16 U.S.C. § 1533. Under this provision, the Secretary:

shall designate critical habitat, and make revisions thereto ... on the basis of the best scientific data available and after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

3. Federal "[a]ction" is defined as:

[A]ll activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United

States.... Examples include, but are not limited to:

(a) actions intended to conserve listed species or their habitat;

(b) the promulgation of regulations;

(c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or

(d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.02 (1996).

4. The Service recently designated critical habitat for the Flycatcher. 62 Fed.Reg. 39, 136. The Lake Mead Delta is not so designated. Therefore, the loss of the Delta habitat does not implicate the second portion of this provision. Plaintiff indicated at oral argument that it may seek review of the designation.

able and prudent alternative and the resultant incidental take of a listed species will not violate § 1536(a)(2), the Service must provide a statement with the biological opinion known as an Incidental Take Statement.[5] 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i) (1996). An Incidental Take Statement must (1) specify the impact of the incidental taking on the species; (2) specify the "reasonable and prudent measures" that the Service considers necessary or appropriate to minimize such impact; (3) set forth "terms and conditions" that must be complied with by the federal agency to implement the reasonable and prudent measures; and (4) specify the procedures to be used to handle or dispose of any individuals of a species actually taken. 50 C.F.R. § 402.14(i) (1996). Members of the endangered species that are harmed during federal action but in compliance with the terms and conditions specified in an Incidental Take Statement "shall not be considered to be a taking of the species concerned." 16 U.S.C. § 1536(o).

If the Service determines in its biological opinion that proposed agency action will violate § 1536(a)(2) and that no reasonable and prudent alternative will alleviate jeopardy, the federal agency, the governor of the State in which the agency action will occur, or a permit or license applicant may apply to the Secretary for an exemption for the agency action. 16 U.S.C. § 1536(g)(1). The exemption application is considered initially by the Secretary for an exemption for the agency action. 16 U.S.C. § 1536(g)(1). The exemption application is considered initially by the Secretary in the manner provided for in § 1536(g) and "shall be considered" by the Endangered Species Committee for a final determination under § 1536(h).[6] Any action for which an exemption is granted under § 1536(h) shall not be considered to be a taking of any endangered species with respect to any activity which is necessary to carry out such action. 16 U.S.C. § 1536(o).

## II. Background of this Action

This action involves the effect of operations of the Lower Colorado River ("LCR") on the Southwestern Willow Flycatcher. The Southwestern Willow Flycatcher ("Flycatcher") is a migratory songbird which nests and breeds during the spring and summer in dense growths of cottonwood-willow riparian habitat in the southwestern United States.[7] The Southwestern Willow Flycatcher is one of five recognized willow flycatcher subspecies. (Final BO at 48). The historical range of the Flycatcher included southern California, Arizona, New Mexico, western Texas, southwestern Colorado, southern Utah, extreme southern Nevada, and extreme northwestern Mexico. Id. In recent years, fewer than 500 Flycatchers have been documented rangewide.[8] Id. at 59.

---

5. Incidental take is defined as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02 (1996).

6. The Endangered Species Committee is popularly known as the "God Committee." 5 Grad, Frank F., *Treatise on Environmental Law*, § 12.04[7][i] at 12–198.4 (1997). It is comprised of the Secretaries of Agriculture, Army, and Interior, the Chairman of the Council of Economic Advisors, Administrator of the Environmental Protection Agency, the Administrator of the National Oceanic and Atmospheric Administration, and one individual from each affected state, as determined by the Secretary of the Interior, and appointed by the President. Id. The Secretary of the Interior acts as the chairman of the Committee. Id.

7. The Flycatcher begins to arrive at breeding grounds in the southwestern United States in late April and May and begins to nest in late May and early June. (Final Biological Opinion, hereafter BiOp at 48). They typically lay three to four eggs at a time. Id. at 48–9. Young begin to acquire the feathers necessary for flight or to "fledge" in late June through mid-July. Id. The Flycatcher typically raises one brood per year but has been documented raising two broods during one season. Id. at 49. In addition, renesting has been documented after nest failure. Id. The lifespan of most Flycatchers is probably two to three years or one to two breeding seasons. Id.

8. The Service estimates that there are approximately 300 to 500 territories with a "substantial proportion of individuals remaining unmated." Id. at 64. A "territory" is a male and female Flycatcher. There are approximately 114 territories at 18 sites in California; 150 territories at 39 sites in Arizona; 173 territories at 19 sites in New Mexico; 13 territories at 6 sites in Colorado; and one or two territories at one or two sites in Utah and Nevada. Id. at 60–4, Table 3. The Service found that "[t]his figure is alarming because, at such low population levels, random demographic, environmental, and genetic events could lead to extirpation of breeding groups and eventually render this species extinct, even if all extant sites were fully protected." Id.

The Flycatcher was "listed" as an endangered species pursuant to the ESA by the Service in February 1995. 60 Fed.Reg. 10694 (February 27, 1995). Availability of Flycatcher habitat has increasingly been reduced by development and water management projects in the southwestern United States over the last several decades.

The largest population of Flycatchers is located in Grant County, New Mexico. (Table 6, Final BO at 61). Other areas support relatively large populations of Flycatchers. These areas include the Modified Roosevelt Dam and the San Pedro River, both in Arizona, and Isabella Reservoir, and the South Fork Kern, Santa Ynez, and San Luis Rey Rivers in California. The status of the Flycatcher in these areas is discussed in more detail below.

Occupied Flycatcher habitat is also located at the Lake Mead Delta ("Delta"). Eight Flycatcher territories have been confirmed in the Delta by survey and another fifteen to twenty territories are believed to exist in the Delta. (Final BO at 105).

The Delta is located at the north end of Lake Mead below the Grand Canyon in Mohave County. Until the late 1980s, this area was under water during normal operations of the LCR in accordance with the decree issued in *Arizona v. California*, 373 U.S. 546, 552, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963) and the Law of the River. (Attachment 6 to PSOF; Final BO at 4–37; Table 2 to Final BO). During a relatively dry period in the late 1980s and early 1990s, the water level in Lake Mead dropped permitting the growth of willow trees in portions of the Delta. *Id.* This area contains approximately 1,148 acres and is currently the second largest continuous patch of native willow habitat known to exist in the Southwest. *Id.* at 104. The Flycatcher began using these areas to nest. *Id.*

In the mid–1990s, the level of water in Lake Mead began to rise to its previous levels. (Final BO at 106, 140–41). Since June 1995, the Delta habitat of the Flycatcher has been inundated to the extent that water has risen above the root crowns of the willow trees in the Delta. (Final BO at 140–41).

Although willows have shown resiliency to inundation for periods of over thirteen months, the extended inundation of the Delta has caused a loss of willows and cottonwoods used by the Flycatcher to nest. *Id.* Continued inundation will result in the destruction of that habitat and has caused and will likely result in the destruction of that habitat and has caused and will likely result in further loss of Flycatcher nests and young.[9] *Id.*

The Bureau of Reclamation ("Reclamation" or "BOR") is responsible for certain activities with respect to the management of the LCR, including Hoover Dam and Lake Mead.[10] As such, Reclamation obtained a biological assessment which found that its proposed actions in connection with the operation and management of the LCR over the next five years were likely to result in take of the Flycatcher and three other species. (Final BO at 1). Reclamation thereafter initiated consultation with the Service. *Id.*

In January 1997, the Service submitted a "Draft Biological Opinion" ("Draft BO") to Reclamation for comment. (Final BO at 3; Draft BO at F274). The Service concluded that Reclamation's proposed action, *i.e.*, operation of the LCR for the next five years, would jeopardize the Flycatcher. (Draft BO at 162). The Service proposed reasonable and prudent alternatives comprised of short- and long-term components. *Id.* at 164.

The Service expressly stated that the short-term components of the proposed RPA

---

9. Damage to the habitat may cause Flycatchers to abandon their territories and attempt to renest in non-inundated areas, but the young are less likely to survive and return to breed than the young from non-inundated nests that fledged earlier in the season. (Final BO; Attach. 4 at 25 to Dkt. 3A).

10. Plaintiff alleges that Reclamation is the federal agency which builds, funds, operates and authorizes dams, water diversions and other water projects in the Lower Colorado River Basin, including Hoover Dam and Lake Mead. Plaintiff further alleges that the Reclamation authorizes, funds, and carries out activities that affect the water level of Lake Mead and that it has the responsibility to insure that these actions comply with the ESA. (Dkt. 40 at ¶¶ 20–21). The Secretary contends that Reclamation has only limited discretion with respect to the water level of Lake Mead.

would not alleviate jeopardy alone and that actions by Reclamation could not alone alleviate jeopardy. *Id.* The Service found that "[i]mmediate jeopardy must be addressed primarily through on-site (LCR) habitat restoration and enhancement and population expansion." *Id.* at 169.

The first provision of the proposed RPA required Reclamation to use "the full scope of its authority and discretions to immediately protect and maintain the 465 ha(1,148 ac) riparian habitat" of the Delta habitat. *Id.* at 170. Under this provision, Reclamation was required to provide the Service with a "detailed account of the type and extent of discretion available to it in the management of Lake Mead." *Id.* In addition, if Reclamation was unable to implement this provision throughout the five year consultation period, it would be required to "defer use of conservation space above elevation 2136 at Roosevelt Lake, Arizona, in order, in the short-term, to maintain [Flycatcher] habitat there until suitable flycatcher habitat [could] be developed elsewhere . . . ." *Id.*

Included with the Draft BO was a proposed incidental take statement. *Id.* at 174. The Service found that even with full implementation of the proposed RPA, forty percent of Flycatcher nesting "attemots" at Lake Mead would be lost to treefall annually. *Id.* The Service anticipated a fifty percent rate of nest loss due to predation and cowbird parasitism throughout the LCR. *Id.*

After receiving the Draft BO, Reclamation submitted its comments. Reclamation advised the Service that under the Law of the River, Reclamation lacked the discretion to reduce the level of Lake Mead except for specific purposes. (Final BO at 4–8). Those purposes are (1) river regulation, improvement of navigation, and flood control; (2) irrigation and domestic uses, including the satisfaction of present perfected water rights; and (3) power generation. *Id.* at 8.

Following receipt of Reclamation's comments, the Service issued a Final Biological Opinion (hereafter "Final BO") in which it found that Reclamation's operation of Hoover Dam and Lake Mead over the next five years placed the Flycatcher in jeopardy. The Service included a "reasonable and prudent alternative" which differed from that in the Draft BO in that it did not require Reclamation to protect the Delta habitat, based upon its lack of discretion to so. Other alternative means were set forth which the Service concluded would alleviate jeopardy to the Flycatcher. The Final BO also included an incidental take statement authorizing take of Flycatchers at the Delta.

Plaintiff contends that the "reasonable and prudent alternative" set forth in the Final BO fails to insure that Reclamation's proposed operation of the LCR will not jeopardize the Flycatcher because it fails to protect the Delta habitat. Plaintiff seeks review of the Final BO pursuant to the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.* Plaintiff seeks remand to the Service to comply with the requirements of the ESA, and specifically, with instructions to protect the Delta habitat. The Secretary seeks summary judgment on the basis that the reasonable and prudent alternative set forth in the Final BO is not likely to jeopardize the continued existence of the species.

### III. Standard on Summary Judgment

Summary judgment is proper "if pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56.

Actions taken by the Secretary pursuant to § 1536 are reviewable pursuant to the APA, 5 U.S.C. § 701 *et seq. See Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 1167, 137 L.Ed.2d 281 (1997). *See also Sierra Club v. Yeutter,* 926 F.2d 429, 439–40 (5th Cir.1991). The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Furthermore, agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. 5 U.S.C. § 706.

■ The issuance of a Biological Opinion and an Incidental Take Statement constitute

final agency action from which legal consequences flow. *Bennett,* 117 S.Ct. at 1167–68. The parties do not dispute Plaintiff's standing to seek review of the Final BO and Incidental Take Statement which, under *Bennett,* is clear. ·

A court reviewing final agency action shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). *See Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy,* 898 F.2d 1410, 1414 (9th Cir.1990) (Navy reliance on BO not arbitrary and capricious where no new evidence not considered by the Service was presented). "The relevant inquiry is whether the agency 'considered the relevant factors and articulated a rational connection between the facts found and choice made.'" *Id.* (quoting *Friends of Endangered Species, Inc., v. Jantzen,* 760 F.2d 976, 981 (9th Cir.1985) (internal citation omitted)). Furthermore, considerable weight is accorded an agency's· construction of the laws it administers. *Id.*

▇▇▇▇ Review under the arbitrary and capricious standard is to be "searching and careful" but "narrow," and a court is not to substitute its judgment for that of the agency. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). "This is ·especially appropriate where the challenged decision implicates substantial agency expertise." *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir.1993) (citing *U.S. v. Alpine Land and Reservoir Co.,* 887 F.2d 207, 213 (9th Cir.1989), *cert. denied,* 498 U.S. 817, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990)). Furthermore, courts should "defer to the agency's interpretation of equivocal evidence, so long as it is reasonable." *Central Arizona Water Conservation Dist. v. United States EPA,* 990 F.2d 1531, 1539 (9th Cir.), *cert.*

denied, 510 U.S. 828, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993). Thus, the Service is entitled to deference in matters related to the protection of endangered species. *Marsh,* 816 F.2d at 1388. Nevertheless, a court must "interpret the statutory provisions of the ESA *de novo.*" *Idaho Farm Bureau Federation v. Babbitt,* 58 F.3d 1392, 1399 (9th Cir.1995), *citing United States v. City of Rancho Palos Verdes,* 841 F.2d 329, 330 (9th Cir.1988); *Pyramid Lake· Paiute Tribe,* 898 F.2d at 1414.

### A. Reasonable and Prudent Alternative (RPA)

In its Final BO, the Service sets forth an RPA comprised of short- and long-term components. The short-term components contemplate development of a "Multi–Species Conservation Program" ("MSCP") which is intended as a long-term effort to protect endangered species, including the Flycatcher.[11] The MSCP is anticipated to be initiated by the time ·that the short-term interim consultation period concludes, *i.e.,* within five years. (Final BO at 157). Reclamation has provided funding and is committed to providing additional funding to the development of this effort and interim conservation measures. *Id.*

### 1. Short-term Components of the RPA

The first short-term component of the RPA is immediate habitat protection/restoration. This entails the "immediate initiation" of a program by Reclamation to protect approximately 1400 acres of currently unprotected riparian habitat. If insufficient occupied habitat is available, then unoccupied, but "high potential" habitat may be protected instead. *Id.* at 160. Protection of at least 500 acres is to be in place by January 1, 1999; the remaining 900 acres must be in place by January 1, 2001. *Id.* The Service

---

**11.** "The [MSCP] has the goal of benefitting more than 100 Federal- or State-listed, candidate and sensitive species ... and their habitats within the States of California, Nevada and Arizona, ranging from aquatic, wetland and riparian, to upland areas." (Final BO at 33–34). The MSCP has two objectives: (1) to conserve habitat and work towards recovery of endangered species pursuant to the ESA and (2) to accommodate current water diversions and power production

and optimize opportunities for future water and power development consistent with the law. *Id.* at 34. The MSCP is described as a "cooperative Federal–Lower Basin States–Tribal–Private effort to conserve ESA-listed and sensitive species dependent on the river." (Final BO at 33). The MSCP is comprised of affected States, regional entities, federal agencies, and private (including conservation) groups' interests.

does not identify specific areas available and suitable for acquisition.

The second short-term component of the RPA is review and evaluation of all fish and wildlife mitigation and enhancement programs involving riparian restoration in the action area. *Id.* at 161. This component is to be undertaken to determine how those programs can be modified to maximize the conservation of the Flycatcher. *Id.* This component is to be completed "for use" in the next breeding season following completion of the Final BO or Spring 1998. *Id.*

The third short-term component requires Reclamation to implement protective management for existing Flycatcher breeding groups and suitable habitat on the LCR. *Id.* Under this provision, Reclamation must complete no later than March 15 of each year for each site occupied during previous years, (1) evaluation and documentation of existing and potential threats; (2) assessment of the potential to resolve the threats at each site; (3) development of management strategies including agreements, cowbird management programs, fire prevention, public education, fencing, etc., with emphasis on larger breeding groups and larger habitat patches;[12] and (4) implementation of those management strategies. *Id.*

The fourth short-term component of the RPA requires Reclamation to fund a five-year survey, monitoring, and research program along the LCR and confluent drainages in adjacent states. *Id.* This step is intended to determine conditions that promote suitable habitat on the LCR and survival of the species. *Id.*

### 2. Long-term Components of the RPA

The Service notes initially that "[f]ull achievement of the RPA requirement of eliminating jeopardy ... will relate directly to how the short-term requirements of this RPA complement the anticipated development and implementation of the 50-year

MSCP." *Id.* Furthermore, to comply with the long-term component of the RPA, Reclamation must either independently or as part of a cooperative effort, such as the MSCP, actually be involved in initiating implementation of each of the following provisions by May 15, 2001, or one-year before the projected end of the consultation period. *Id.*

The first long-term provision of the RPA is procurement of alternative compensation habitat. By January 1999, Reclamation shall present a plan to the MSCP for funding and implementation of the long-term program with the goal of initiating implementation by May 15, 2001. *Id.* at 162–63. Potential habitat is not specifically identified.

Secondly, Reclamation shall continue to be "an active participant in the MSCP process and will encourage involvement from all Federal and non-Federal parties involved in the operation of the LCR to achieve the stated conservation goal of the MSCP." *Id.* at 163.

Third, Reclamation must provide the Service with a detailed account of the "type and extent of the discretionary action flexibility available to it for all elements of the proposed action, under existing legal and contractual obligations, further clarifying any limits on such flexibility" outlined in Table 1 to the Final BO. *Id.* Reclamation must also identify any opportunities to increase its "discretionary action flexibility" in cooperation with other parties within 18 months after completion of the Final BO (or approximately September 1998). *Id.* at 163–64. It is unclear with respect to what activities Reclamation will seek greater discretion, for example, water elevation of Lake Mead.

Fourth, Reclamation must "collect, review, and synthesize" available information on channelization modification or removal projects undertaken or planned for comparable river systems.[13] *Id.* at 164. This information is to be used to evaluate the potential modification or removal of channelization

---

12. The Service documents the substantial impact that cowbird parasitism has had on the Flycatcher. Cowbird parasitism occurs in or near agriculturally developed areas. Cowbirds lay their eggs in the nest of other birds. Because cowbirds tend to hatch sooner than Flycatcher young, they receive the benefit of early nurturance from the Flycatcher parent leaving less

available for Flycatcher offspring and decreasing the viability of Flycatcher young. (Final BO at 49–50, 55–58).

13. Flycatcher habitat formerly was widespread in the floodplain of the LCR but due to channelization periodic flooding is controlled decreasing Flycatcher habitat.

works from certain areas of the LCR with the goal of restoring large expanses of diverse habitat. *Id.*

Fifth, Reclamation must use its discretion to develop agreements with all MSCP parties and others to acquire property and other resources to enable implementation of all of the RPA provisions. *Id.*

Sixth, Reclamation must meet with the Service annually during the consultation period to review and evaluate progress on the RPA. *Id.* at 165.

Seventh, if Reclamation fails to fully implement the RPA requirements, or the MSCP process fails, Reclamation must reinitiate consultation. *Id.* at 165–66.

The Service concludes that implementation of the short- and long-term components are likely to insure that Reclamation action does not jeopardize the Flycatcher.

### B. Incidental Take Statement

Even with full implementation of the RPA, the Service anticipates incidental take of the Flycatcher due to "project-related activities in the form of riparian habitat degradation and loss, reduced productivity of adults, and reduced survivorship of adults and young." *Id.* at 168. The Service anticipates nest loss/abandonment resulting from treefall, fire, cowbird parasitism, and recreational activities. *Id.* The Service anticipates habitat loss and degradation due to fire, desiccation, encroachment by saltcedar, and the operation of dams, diversions, levees, and banklines which will result in displacement of adults, reduced productivity, and reduced survivorship of adults and young. *Id.*

The Final BO therefore includes an Incidental Take Statement permitting take "based on the premise that the RPA herein will be implemented." *Id.* at 166. Inadequate information was available to quantify actual take due to nest and habitat loss resulting from fire, desiccation, encroachment by saltcedar, recreational activities, and the operation of dams, diversions, levees and banklines. *Id.* The Service noted that when habitat is destroyed or regeneration impeded, population maintenance and expansion

are precluded. *Id.* Therefore, with respect to unquantifiable take, incidental take is considered to be exceeded if reasonable and prudent measures and terms and conditions are not implemented. *Id.* The Service concluded that the level of anticipated take related to Reclamation action was not likely to result in jeopardy to the species if the RPA is fully implemented. *Id.* at 169.

The Service sets forth two reasonable and prudent measures with respect to the Flycatcher. *Id.* at 170. First, Reclamation "will protect" the Flycatcher on the LCR. *Id.* Second, Reclamation "will conduct additional surveying and monitoring" of Flycatcher habitat on the LCR. *Id.*

To implement the first measure, Reclamation must protect occupied Flycatcher habitat regardless of plant species composition, and unoccupied, but potential Flycatcher habitat, including stands of willow, cottonwood-willow, and mixtures of saltcedar and cottonwood-willow in all portions of the LCR under its management, unless removal of saltcedar would result in improved Flycatcher habitat.[14] *Id.* at 174. Reclamation may not remove saltcedar in an extant or recently-extant Flycatcher location. *Id.* Protection actions include cowbird trapping in and near occupied habitat, fire breaks, and measures such as levee road closures to limit recreational disturbance of occupied sites. *Id.*

With respect to areas not under Reclamation management, Reclamation must immediately develop agreements with appropriate land management agencies along the LCR to implement a cowbird trapping program in specific areas where cowbird parasitism rates exceed 10% at any LCR site during the five year period. *Id.* In addition, Reclamation must develop agreements with appropriate land management agencies along the LCR to put in and maintain fire breaks to protect occupied or potential Flycatcher habitat from wildfire within one year of the date of the Final BO (or April 1998). *Id.* Reclamation must also develop agreements with appropriate land management agencies along the LCR to close levee roads and put in place

---

14. The Service notes in the Final BO that the growth of saltcedar can exacerbate fire hazard and retard growth of other types of Flycatcher habitat. However, the Service also notes that the Flycatcher sometimes nests in saltcedar habitat. (Final BO at 50–53).

and enforce other public closures necessary to minimize impacts to the Flycatcher from fire and disturbances within one year from the date of the Final BO (or April 1998). *Id.* Reclamation must also develop agreements with appropriate land management agencies along the LCR to close levee roads and put in place and enforce other public closures necessary to minimize impacts to the Flycatcher from fire and disturbances within one year from the date of the Final BO (or April 1998). *Id.* Finally, Reclamation must initiate a public information program within one year of the date of the Final BO to alert resource users about the dangers of wildfire to riparian habitat. *Id.*

To implement the second measure, Reclamation must conduct additional status surveys of all occupied and potential Flycatcher habitat on the LCR for the next five years and make a representative sample each year after that, or until alternative means of reducing take have been negotiated with the Service, to determine the number of Flycatcher territories, the number of breeding pairs, the breeding status of pairs, rates of cowbird parasitism, predation rates, nest success, biotic and abiotic habitat relationships of occupied sites, and the genetic relationships of Flycatchers throughout the LCR for comparison with genetic data obtained from Flycatchers breeding at Roosevelt Lake and the San Pedro River. *Id.* at 174–75. Reclamation must deliver a report of the findings to the Service no later than December 1 annually. *Id.* at 175.

In addition, Reclamation must determine the effectiveness of the fire break and recreational access measures by monitoring location, size, and timing of fires on the LCR. *Id.* Such monitoring must include acquisition of both ground and aerial color transparencies of all occupied or potential Flycatcher habitat areas that are burned by fire. *Id.* Reclamation must provide the Service with a yearly report no later than September 30 each year and must include photographs, summary of fire activity over that period, habitat affected, effectiveness of closures and fire breaks, and recommendations for the coming year that can be transmitted to other agencies. *Id.*

Finally, the Final BO requires Reclamation to reinitiate consultation:

where discretionary Federal agency involvement or control over the action has been maintained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in [the Final BO]; (3) the agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in [the Final BO]; or (4) a new species is listed or critical habitat designated that may be affected by the action.

*Id.* at 179. The Service anticipates reinitiation if the MSCP is not realized as planned. *Id.* at 179–80. In addition, in instances where the amount or extent of incidental take is exceeded, operations causing such take must cease pending reinitiation of consultation. *Id.* at 180.

## VI. *Analysis*

Plaintiff contends that the Final BO is arbitrary and capricious because the Secretary (1) fails to satisfy the explicit statutory criteria for issuance of an RPA following a jeopardy determination; (2) fails to sufficiently identify lands to be obtained to alleviate jeopardy; and (3) bases the RPA upon political considerations.

### A. *Failure to Comply with Statutory Criteria*

Plaintiff argues that the Service failed to comply with statutory criteria by (1) allowing Reclamation to continue operation of the LCR without ensuring the alleviation of jeopardy to the Flycatcher at Lake Mead and (2) by failing to set forth steps which can be taken by Reclamation to implement the agency action.

### 1. *Continuation of Action Without Alleviation of Jeopardy*

Plaintiff agrees that the Service correctly found that "operations, as proposed, are likely to jeopardize" the Flycatcher, but argues that the Service has failed to set forth an RPA which will alleviate that jeopardy. (Motion at 10). Plaintiff contends that the

RPA proposes "only studies and totally speculative off-site future habitat protection, with no changes to the operation of Lake Mead." *Id.* Plaintiff thus contends that the Service failed to set forth an RPA which is likely to alleviate jeopardy to the Lake Mead Flycatcher population and that the nature of the proposed RPA is not likely to alleviate jeopardy to the Flycatcher generally on the LCR.

Plaintiff contends that the RPA is arbitrary and capricious because it fails to protect the Lake Mead habitat. The only case cited by Plaintiff in this section of its memorandum is *American Rivers v. National Marine Fisheries,* 109 F.3d 1484, 1489 (9th Cir. 1997).

In *American Rivers,* the Service proposed an RPA in a 1995 BO which took a "tiered approach to reach a no-jeopardy determination, on the grounds that sufficient scientific information [was] not available to determine with confidence what measures [were] necessary to ensure ultimate recovery of the listed salmon." 109 F.3d at 1489–90, n. 11. The RPA outlined "a process of planning and evaluation designed to reduce the uncertainty about the likely benefits and feasibility of major structural modifications to the River Power System." *Id.* That RPA called for various immediate actions necessary to improve survival until the long term recovery measures could be determined and take effect. *Id.* The interim measures included a combination of operational changes to the River Power System. *Id.* The Ninth Circuit dismissed based upon the failure to file the required sixty day notice with respect to the 1995 BO; the court did not reach whether the 1995 BO failed to insure that jeopardy was likely to be avoided.

Plaintiff cites no authority supporting that the Service must propose an RPA which alleviates jeopardy as to each and every location that an endangered species is found and upon which federal action impinges rather than proposing an RPA which, while not removing jeopardy as to a particular location, is reasonably likely to alleviate jeopardy to the species generally.[15] The Service has concluded that the jeopardy posed by Reclamation action on the LCR will be alleviated if the RPA and the reasonable and prudent measures and terms and conditions of the incidental take statement are implemented. The Service's conclusions are entitled to deference unless Plaintiff establishes that the Service's conclusions were arbitrary and capricious. Plaintiff has not shown that the failure to require the protection of the Delta habitat renders the RPA unlikely to avoid jeopardy or otherwise renders it arbitrary and capricious. The Court does not conclude that the RPA was arbitrary merely because it does not protect the Lake Mead Flycatcher population.

### 2. Implementation of Agency Action

▮ Plaintiff also argues that the RPA is deficient because it fails to delineate "how Reclamation can modify its 'implementation' of the 'agency action'—*i.e.,* by regulating water levels differently or otherwise—so as to avoid the ongoing loss of the contiguous 1,148 acre patch of native willows at Lake Mead, while setting certain and achievable targets for habitat restoration and long-term mitigation measures to avoid extinction." (Motion at 14). Plaintiff contends that this deficiency violates § 1536(b)(3)(A)'s requirement that an RPA articulate steps which can be adopted in "implementing the agency action." Plaintiff also contends that the RPA "merely suggests that Reclamation make an effort to acquire replacement habitat in the future," which it argues does not satisfy § 1536(a)(2). Plaintiff contends that the RPA fails to suggest " 'specific measures to manage for willow survival' and no change in 'current operations' to avoid the 'significant, if not complete mortality' that is expected before the 1998 growing season." (Motion at 13).

---

15. Furthermore, although not dispositive of the issue before the Court, the Secretary has presumptively determined that the failure to designate the Delta habitat as critical habitat will not result in the Flycatcher's extinction. Under § 1533, the Secretary may not exclude habitat of an endangered species as critical habitat unless he determines "based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned." The Secretary recently designated critical habitat for the Flycatcher. The Delta habitat was not designated as critical. Although Plaintiff indicates that it may seek review of the Secretary's designation, the Secretary's designation has not been set aside and his designation is entitled to deference.

The " 'significant, if not complete mortality' " refers to the Lake Mead habitat and the Lake Mead Flycatcher population, not LCR Flycatcher habitat or the Flycatcher generally. Again, Plaintiff argues that the RPA must ensure that the Lake Mead habitat and Lake Mead Flycatcher population are not jeopardized. Plaintiff again bases its arguments on the findings of the Service, before it considered the RPA.

As discussed above, Plaintiff has cited no authority supporting that an RPA must protect every location in which an endangered species may be found. Furthermore, Plaintiff has not shown that the Service's conclusion that jeopardy is likely to be avoided if the proposed RPA is implemented is arbitrary.

Plaintiff also faults the RPA for providing for the immediate initiation of a program to protect potential or actual Flycatcher habitat, but failing to identify the habitat to be protected or the means by which that habitat is to be protected. Plaintiff notes that while this provision requires the "immediate" initiation of such a program, it does not require the first 500 acres to be protected until January 1, 1999 or the additional 900 acres to be protected until January 1, 2001. (Final BO at 160). Plaintiff also contends that the RPA fails to require replacement habitat to be established, with the necessary ecological restoration, by a date certain and specifically before the destruction of the Lake Mead habitat. Plaintiff relies on *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir.1987), for the proposition that an RPA must provide for the establishment of replacement habitat before existing habitat can be adversely affected by proposed agency action to avoid being arbitrary and capricious.

In *Marsh*, construction of a combined highway and flood control project threatened a significant portion of two endangered birds' dwindling habitat; this habitat had been identified as "essential" to their survival. *Id.* at 1378. San Diego County had agreed to obtain certain replacement property and transfer it to the designated agency to reduce delay if the parties otherwise had to seek authorization from Congress for the purchase of the replacement lands. *Id.* at 1380. The County and the agencies entered

a contract requiring the transfer of the parcel within one year of the contract's execution. *Id.* However, the County failed to comply. *Id.*

The appellant asked the district court to enjoin the project due to San Diego County's failure to transfer the 188 acres of land necessary to mitigate the project's effects on the habitat and to require reinitiation of consultation regarding the possibility of increased development on nearby private lands. 816 F.2d at 1378. The district court denied the request. The Ninth Circuit reversed.

The Ninth Circuit found an abuse of discretion where the parties had failed to comply with a "vital" provision of the RPA, *i.e.*, purchase of the mitigation parcel. *Id.* at 1379–80. The Ninth Circuit also found that reinitiation of consultation was necessary where new development of areas near the mitigation lands had been approved. *Id.* at 1381.

The court held that injunctive relief, under the more lenient standard applicable under the ESA, was appropriate if the COE "violated a substantive or procedural provision of the ESA by allowing construction to continue in the face of the County's failure to transfer the mitigation lands or by refusing to reinitiate consultation with the FWS." *Id.* at 1384. The court found that the COE's failure to reinitiate consultation after the County failed to transfer the mitigation parcel and new development of nearby areas had been proposed constituted an abuse of discretion where the Service had concluded that control and management of the 188 acres by a public agency was "the minimum necessary" to mitigate the effects of the project. *Id.* at 1385.

The court noted that "[t]he COE's actions fall far below *insuring* that the project is not likely to jeopardize the continued existence of the birds" and that the district court erred in looking only at the potential for harm to the mitigation lands and "ignoring the project's present effects on other areas of the birds' habitat." *Id.* The court further noted that the COE was "allowing the project's adverse effects to accumulate without implementing the mitigation measures or making certain they will occur" and "relying on the district court [to resolve] the issue of the disputed easements in its favor [which would enable

the transfer of the mitigation lands]." *Id.* The court noted that COE's reliance on the proposed actions of others did not satisfy its burden of ensuring that its actions did not jeopardize the continued existence of the endangered species. *Id.* (citing *National Wildlife Fed'n v. Coleman,* 529 F.2d 359, 374 (5th Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976)).

It is clear in the context of its opinion that the court refers to COE's failure to comply with the unchallenged RPA, which, if followed, would alleviate jeopardy, or to reinitiate consultation due to changed circumstances, rather than to a requirement that COE avoid jeopardy independent of the RPA or reinitiation. *Id.* at 1385–86, 1388. Thus, *Marsh* does not stand for the proposition that an RPA must provide for acquisition of replacement habitat before existing habitat can be adversely affected by agency action, as argued by Plaintiff. Instead, *Marsh* requires federal agencies to comply with existing (and unchallenged) RPAs or to reinitiate consultation to revise RPAs so that jeopardy is reasonably likely to be alleviated.

The Court is mindful of the Flycatcher's precarious status as documented in the Final BO. Nevertheless, the Service has concluded that the loss of the Lake Mead habitat, although significant, will not jeopardize the Flycatcher if Reclamation complies with the RPA and the incidental take statement. Nor does the Service conclude that the loss of the Lake Mead habitat requires the immediate substitution of replacement habitat to successfully alleviate jeopardy to the Flycatcher. The RPA is not rendered arbitrary and capricious merely because it does not contemplate the preservation of the Lake Mead habitat or the replacement of that habitat before LCR operations continue.

The RPA contemplates a series of steps in the short term to alleviate jeopardy to the Flycatcher posed by a host of threats along the LCR. These threats include wildfire, predation, cowbird parasitism, recreational activities, and channelization. Among the short-term steps to avoid jeopardy to the Flycatcher is the acquisition of replacement

habitat. Although the Final BO reflects that the available suitable habitat is relatively scarce, Plaintiff has not demonstrated, nor does the Final BO conclude that replacement habitat cannot be obtained in the near future. The RPA also contemplates the initiation of long-term planning to protect the Flycatcher and other endangered species and their habitat along the LCR. The failure to follow through on these provisions requires the reinitiation of consultation.

The RPA sets forth a variety of threats facing the Flycatcher and steps to reduce those threats and to acquire and develop replacement habitat along the LCR in the short-term, as well as requiring further conservation efforts in the long-term. Both the Final BO and other documents in the record support that several thousand acres are available within the Flycatcher's range for acquisition. (Final BO at 103–104; see AR F172). The Court does not conclude that the RPA is arbitrary and capricious because it does not require the protection of the Delta habitat.

*B. Sufficiency of Mitigation Lands*

█ Plaintiff next argues that even if replacement habitat were immediately available, it would be insufficient to avoid jeopardy to the Flycatcher because the Flycatcher requires large continuous patches of habitat, such as the Lake Mead Delta, to survive and Lake Mead is one of only two or three such areas remaining within the Flycatcher's range; that there is insufficient replacement habitat available within the Flycatcher range; and that the acquisition of 1,400 replacement acres will not mitigate the loss of the Lake Mead habitat due to the loss-disperse-decrease phenomenon, particularly where replacement habitat is likely to be fragmented. (Motion at 15–16).

The Final BO reflects the relative paucity of riparian habitat available as replacement habitat for the Flycatcher in comparison to its historical range. (Final BO at 103–104). Nevertheless, it reflects that sufficient habitat exists to replace that lost at the Lake Mead Delta.[16] *Id.*

16. In addition, the Service noted that not all potential habitat along the LCR has been surveyed. (Final BO at 105).

Plaintiff also argues that the failure to identify replacement habitat makes it impossible to know how many patches the 1,400 acres will be comprised of, their proximity to one another, their size, susceptibility to fire and cowbird infestation, or the horticulture of the acreage, and thus, the likelihood that the mitigation acreage will alleviate jeopardy when it is obtained. However, the Final BO provides that the area to be protected immediately should be:

approximately 1,400 ac (565 ha) of currently unprotected **riparian** habitat that is currently used by [the Flycatcher], preferably in the LCR area, but if insufficient land is available, then elsewhere within the [Flycatcher's] range. If insufficient seasonally occupied habitat can be identified to be in need of protection, then *un*occupied, but high potential, habitat may be protected.

Final BO at 163 (emphasis added). Suitable habitat is to be selected in conjunction with "the plan called for in the long-term flycatcher alternative compensation habitat provision, number 11." *Id.* Pursuant to this provision, "[c]riteria for suitable or potential flycatcher habitat" are based upon the known characteristics of Flycatcher habitat as discussed in the Final BO. *Id.* at 50–51. The Court concludes that the Service has sufficiently identified the type of replacement habitat to be acquired and that the Service did not abuse its discretion in concluding that 1,400 acres of habitat suitable for Flycatchers could be acquired.

Plaintiff also contends that even if sufficient suitable replacement habitat can be acquired, the RPA is arbitrary because it fails to specifically identify the replacement habitat to be acquired and that such habitat is likely to be composed of numerous small patches. Plaintiff contends that fragmented replacement habitat will lead to the loss-disperse-decrease phenomenon.

The Final BO notes that the loss-disperse-decrease phenomenon can lead to an increase in the number of sites occupied regionally in the short-term while masking a long-term decrease in population size and fecundity. (Final BO at 142). Defendant contends that since the long-term effects are ultimately most significant, the Service's focus on a balance between short-term protections and long-term "solutions" is reasonable to ensure that the species will survive for eighteen months until 500 acres are protected, then survive another two years until an additional 900 acres are protected, and ultimately survive until the MSCP process undertakes restoration efforts. Defendant argues that this effort will represent "the amount of historical [Flycatcher] habitat lost or precluded from developing into suitable flycatcher habitat due to inundation, lack of flooding, widely fluctuating water levels, exotic species encroachment, water quality, soil salinity, or permanent structures because of continuing effects of Reclamation's facilities and operations." Final BO at 163.

As noted herein, the Flycatcher faces a variety of dangers to its survival. These include wildfire, predation, cowbird parasitism, and recreational activities, in addition to the proposed action on the LCR and fragmentation and decrease in the amount of available habitat. The RPA addresses many of the threats facing the Flycatcher **over the entire course of the LCR** and its range in the short-term, whether arising from past, present or future acts of Reclamation or others, until long-term solutions can be put in place. Although the preservation of the Delta habitat would undoubtedly benefit the Flycatcher, the Court does not conclude that the failure to do so renders the RPA arbitrary and capricious.

Plaintiff also argues that it is extremely unlikely that a suitable parcel of replacement habitat could be found based upon the Secretary's finding of "the paucity of relatively large, contiguous tracts of native riparian habitat throughout the flycatcher's current range." (Motion at 16). Plaintiff notes that the only patch of continuous willow habitat within the Flycatcher range equivalent to the Lake Mead habitat is that at Isabella Reservoir, which is already occupied by Flycatchers.[17] Plaintiff argues that up to 1,100 acres along the South Fork Kern River area of Isabella Reservoir may render that habitat unavailable for Flycatchers. Plaintiff also argues that the authorization for operation of the Modified Roosevelt Dam by the Secre-

---

17. Plaintiff implies that this area could not support additional Flycatchers.

tary, despite a finding of jeopardy, and authorization for the incidental taking of 45 territories (90 birds) at the Dam (the entire population), deprive the Flycatcher of this habitat.

Defendant refers the Court to the Biological Opinions issued with respect to Isabella Reservoir ("1997 Isabella BO") and the modified Roosevelt Dam project ("Roosevelt BO").

Flycatcher habitat at Isabella Reservoir consists of two primary areas suitable for nesting Flycatchers. (1997 Isabella BO at 25). These are the Kern River Preserve and the South Fork Wildlife Area. *Id.* The South Fork Wildlife Area has been repeatedly inundated by rising water levels of Isabella Reservoir. *Id.* at 22. In response, the COE, which operates the Reservoir, committed to protect 360 acres of habitat in 1997 which the Service found "may serve to offset the loss of available breeding space and habitat suitability resulting from a third year of inundation of the 510 acres of habitat found up to the [inundation level]." *Id.* at 34. The COE also entered into an interagency conservation agreement to ensure that sufficient habitat would be protected to offset losses as a result of long-term operations at the Reservoir. *Id.* Based on these steps, the Service found that the operation of the Reservoir was not likely to jeopardize the continued existence and recovery of the Flycatcher. *Id.* at 37–38.

With respect to Roosevelt Dam, the Service found that Reclamation's proposed modifications to the Dam were likely to jeopardize the Flycatcher. (Roosevelt BO at 20). These modifications would add storage space between 2136 and 2151 feet above sea level. *Id.* at 4. If the additional storage space is used, Flycatcher habitat at Roosevelt Dam would be partially to totally inundated. *Id.* at 20. The Service proposed an RPA which required Reclamation to delay using the new storage space during the 1996 breeding season to provide time to replace the habitat that would be lost by completion of the modification. *Id.* at 30. Reclamation was also required to replace the habitat lost with contiguous habitat sufficient in size to support a minimum of 45 Flycatcher territories near an existing Flycatcher population or in an historically occupied location. *Id.* at 32.

Replacement habitat was purchased on the San Pedro River adjacent to a Flycatcher population in Pinal County. However, in 1996, approximately eleven of eighteen territories on the San Pedro River were burned and most of the birds were no longer present in the area after the fire. *Id.* at 12. However, fifteen territories remained upstream from that area at Cook's Lake. *Id.*

Defendant points out that while the Roosevelt habitat may at some point be inundated for flood control or water storage purposes, those conditions have not occurred yet and may not occur before replacement habitat is in place. That habitat is not currently inundated. Defendant further points out that even if the habitat were inundated today, at least portions of the habitat would likely be usable by the Flycatcher for some time, just as habitat at Lake Mead has survived for some period after inundation. Defendant also notes that seven territories survived the San Pedro fire and another fifteen territories exists at nearby Cook Lake which enhances the value of the newly acquired property for the species.

The Court concludes that the Service did not abuse its discretion in fashioning the RPA regarding operations on the LCR by providing for the acquisition of replacement habitat over the next eighteen to forty-eight months. The Court further concludes that the Service did not abuse its discretion in fashioning the RPA in light of the status of the Modified Roosevelt Dam and Isabella Reservoir projects.

## C. The RPA is Improperly Based Upon Political Concerns

■ Finally, Plaintiff argues that the decision not to protect the Lake Mead habitat was based upon improper political influence or concerns rather than the "best scientific and commercial information available." 16 U.S.C. § 1536(a)(2). Plaintiff contends that if jeopardy is found, "the Secretary's RPAs and an Incidental Take Statements [sic] must avoid jeopardy." (Motion at 18). Plaintiff again argues that the RPA fails to alleviate jeopardy because it fails to protect the Lake Mead habitat allegedly based upon improper political considerations. In support of this

contention, Plaintiff compares the Service's conclusions in the Draft BO to those in the Final BO and exchanges between the agencies in connection with the revision of the Final BO.

Plaintiff contends that the Draft BO recommended that "water levels at Lake Mead be immediately lowered, that all flycatcher habitat at Lake Mead be protected, and that no further loss of flycatcher habitat be permitted." Defendant agrees with this contention. Plaintiff points out that a briefing statement prepared for the Service's Regional Director anticipated adverse political reaction to the RPA included in the Draft BO.

The RPA in the Draft BO was comprised of short- and long-term components. (Draft BO at 164). The Service expressly stated that the short-term components of the proposed RPA would not alleviate jeopardy alone and that actions by Reclamation could not alone alleviate jeopardy. *Id.* The Service found that "[i]mmediate jeopardy must be addressed primarily through on-site (LCR) habitat restoration and enhancement and population expansion." *Id.* at 169. The first provision of the proposed RPA required Reclamation to use "the full scope of its authority and discretions to immediately protect and maintain the 465 ha (1,148 ac) riparian habitat" of the Delta. *Id.* at 170. Pursuant to this provision, Reclamation was required to provide the Service with a "detailed account of the type and extent of discretion available to it in the management of Lake Mead." *Id.* In addition, if Reclamation were unable to implement this provision throughout the five year consultation period, it would have been required to "defer use of conservation space above elevation 2136 at Roosevelt Lake, Arizona, in order, in the short-term, to maintain [Flycatcher] habitat there until suitable flycatcher habitat [could] be developed elsewhere . . . ." *Id.*

Although the parties view this provision as requiring a reduction in the level of Lake Mead, the provision was not so broad. The Draft BO did not require Reclamation to immediately lower water levels of Lake Mead, but to immediately clarify the parameters of its discretion to do so.

With respect to Reclamation conferring with the Service, the implementing regula-

tions provides that "[t]he Service will utilize the expertise of the Federal agency . . . in identifying [reasonable and prudent] alternatives." 50 C.F.R. § 402.14(g)(5). In response to the Draft BO, Reclamation advised the Service that it lacked discretion to reduce the level of Lake Mead under the Law of the River. (Final BO at 8–10). The Final BO reflects that the change from the RPA in the Draft BO to that in the Final BO was the result of a clarification of Reclamation's discretion to decrease the level of Lake Mead. Although Plaintiff argues that the Service failed to independently determine the extent of Reclamation's discretion, even if Reclamation has complete discretion in the management of Lake Mead, the relevant inquiry is whether the RPA in the Final BO alleviates jeopardy. Although the RPA in the Final BO does not require the preservation of the Delta habitat, that does not *per se* render it arbitrary or capricious and this Court has concluded that the RPA is not otherwise arbitrary and capricious.

Accordingly,

Plaintiff's motion for summary judgment will be denied. Defendant's cross-motion for summary judgment will be granted.

The Court being fully advised,

**IT IS ORDERED** granting Plaintiff's motion for leave to file overlength brief. (Dkt. 84).

**IT IS FURTHER ORDERED** granting Plaintiff's motion for expedited consideration of its motion for summary judgment. (Dkt. 85).

**IT IS FURTHER ORDERED** granting Plaintiff's motion to file overlength response and reply. (Dkt. 119).

**IT IS FURTHER ORDERED** granting Defendant's motion for leave to file overlength brief. (Dkt. 97).

**IT IS FURTHER ORDERED** granting the Regional Entities' motion to exceed the page limit. (Dkt. 102).

**IT IS FURTHER ORDERED** granting the States leave to appear at oral argument on the motions for summary judgment. (Dkt. 114).

**IT IS FURTHER ORDERED** denying Plaintiff's motion to strike declarations of Laura Herbranson and Nancy Kaufman. (Dkt. 132).

**IT IS FURTHER ORDERED** denying Plaintiff's motion for summary judgment. (Dkt. 81).

**IT IS FURTHER ORDERED** granting Defendant's cross-motion for summary judgment. (Dkt. 95).

**IT IS FURTHER ORDERED** denying the renewed motions to dismiss as moot. (Dkt. 115).

**IT IS FURTHER ORDERED** denying as moot the Central Arizona Conservation District's motion to intervene. (Dkt. 117).

**IT IS FURTHER ORDERED** denying as moot Imperial Irrigation's motion to intervene. (Dkt. 128).