**DEFENDERS OF WILDLIFE, et al., Plaintiffs,**

v.

**Gale NORTON, Secretary, Department of the Interior, et al., Defendants.**

**No. CIV.A. 00–1544(JR).**

United States District Court, District of Columbia.

March 31, 2003.

Katherine A. Meyer, Eric R. Glitzenstein, Meyer & Glitzenstein, William J. Snape III, Defenders of Wildlife, Washington, Counsel for Plaintiffs.

Samuel D. Rauch II, U.S. Department of Justice, Environment & Natural, Resources Division, Washington, Counsel for Federal Defendants.

Virginia S. Albrecht, Andrew J. Turner, Hunton & Williams, LLP, Washington, Counsel for Amici Curiae Central Arizona Water Conservation District, Coachella Valley Water District, Imperial Irrigation District, Metropolitan Water District of Southern California, San Diego County Water Authority, Arizona Power Authority.

Edward J. McGrath, David A. Fitzgerald, Verner, Liipfert, Bernhard, McPherson & Hand, Chartered, Washington, John B. Weldon Jr., Lisa M. McKnight, Salmon, Lewis & Weldon, PLC, Phoenix, AZ, Counsel for Amici Curiae Salt River Project Agricultural Improvement & Power District, Power District and Salt River Valley Water Users' Association.

Douglas S. Burdin, Hunton & Williams LLP, Washington, DC, Charles K. Hauser, John J. Entsminger, Southern Nevada Water Authority, Las Vegas, NV, Counsel for Amici Curiae Southern Nevada Water Authority.

James H. Davenport, Sara A. Price, Office of the Attorney General, Las Vegas, NV, Counsel for Amicus Curiae Colorado River Commission of Nevada.

Wilbert J. Taebel, Arizona Department of Water Resources, Phoenix, AZ, Counsel for Amici Curiae State of Arizona.

Bill Lockyer, Mary E. Hackenbracht, Douglas B. Noble, Sylvia Cano Hale, Office of the Attorney General, Los Angeles, CA, Linus Masouredis, California Attorney, General's Office, Oakland, CA, Counsel for Amici Curiae State of California, ex rel. Bill Lockyer.

J. Michael Klise, Kirsten L. Nathanson, Crowell & Moring, L.L.P., Washington, Norman D. James, Fennemore Craig, P.C., Phoenix, AZ, Wade Noble, Yuma, AZ, Counsel for Amici Curiae Wellton–Mohawk Irrigation and Drainage District, Yuma County Water Users' Association, Yuma Mesa Irrigation and Drainage District, Yuma Irrigation District.

Carol D. Angel, Senior Assistant Attorney General, Natural Resources and Envi-

ronment Section, Denver, CO, Counsel for Amici Curiae State of Colorado.

Stephen R. Farris, Assistant Attorney General, Santa Fe, NM, Counsel for Amici Curiae State of New Mexico.

Michael M. Quealy, Assistant Attorney General, Salt Lake City, UT, Counsel for Amici Curiae State of Utah.

Thomas J. Davidson, Deputy Attorney General, Cheyenne, WY, Counsel for Amici Curiae State of Wyoming.

### MEMORANDUM

ROBERTSON, District Judge.

This lawsuit, brought by four American and four Mexican environmental groups, alleges violations of the Endangered Species Act (ESA) by the Bureau of Reclamation (Reclamation), the Fish and Wildlife Service (FWS), and the National Marine Fisheries Service (NMFS), in connection with Reclamation's management of the lower Colorado River. During the pendency of this suit, defendants completed a recovery plan for the Southwestern Willow Flycatcher, mooting plaintiffs' claim that the defendants had failed to issue the recovery plan and leaving just one claim— that the defendants failed to satisfy the consultation requirements of the ESA with regard to protected species in the Colorado River Delta in Mexico. Both parties have moved for summary judgment. For the reasons set forth below, defendants' motion will be granted.

### Background

### I. Development of the lower Colorado and the "Law of the River"

The Colorado River flows approximately 1,400 miles from the Rocky Mountains southwest to the Gulf of California in Mexico, dropping more than 12,000 feet and draining portions of seven states along the way. Updating of Hoover Dam Documents (1978), Administrative Record (AR) Bureau of Reclamation (BOR) Part I at 1. Prior to human development, water volume varied widely from season to season and from year to year, so that the river continually deposited new sediments, shifted its channel, and created and destroyed habitat. Plants and animals adapted to these extremes and developed distinct communities in flood plains, in marshes, and in the river itself. Final Biological Opinion (Apr. 30, 1997), AR FWS F–316 at 74–81.

In the late 1800's, developers began using the Colorado River for large scale irrigation projects. By 1920, California's users were diverting nearly all water from the river in times of low flow. AR BOR Part I at 1–3. Worried that California would claim appropriative rights before their own populations could put the water to use, upstream states pushed for a formal agreement to divide river waters equitably. The resulting Colorado River Compact of 1922 allocated 7.5 million acre-feet[1] to the "upper basin" states (Colorado, Wyoming, Utah, and New Mexico) and 7.5 million acre-feet to the "lower basin" states (California, Arizona, and Nevada). Colorado River Compact of 1922, Art. III(a), AR BOR Part I at 4.

States and local communities also lobbied the federal government to build dams, in order to foster additional growth and protect already developed areas from unpredictable flooding. In 1928, Congress passed the Boulder Canyon Project Act,

---

**1.** An acre-foot of water is 325,850 gallons, or the amount needed to cover one acre of land with water one foot deep. It can support a family of five for one year. *Black's Law Dic-* *tionary* 25 (6th ed.1990); *Cent. Ariz. Water Conservation Dist. v. United States,* 32 F.Supp.2d 1117, 1121 (D.Ariz.1998).

approving the Colorado River Compact and authorizing construction of the Hoover Dam. AR BOR Part I at 5. The Hoover Dam, when it was completed in 1935, inundated miles of riparian habitat, blocked high flows in spring and early summer, and trapped massive amounts of sediment in the Lake Mead reservoir. The dam released, not only a smaller volume of water, but consistently cold and clear water. The result was significant changes in fish habitats. AR FWS F–316 at 81–90. Over the following fifteen years, two more major dams, four irrigation canals, and several smaller facilities were constructed, further changing river flows and fragmenting habitats. *Id.*

In 1944, the federal government signed a treaty with Mexico guaranteeing that country 1.5 million acre-feet of water per year from the Colorado (up to 1.7 million acre-feet in flood years) and allocating to Mexico any other waters arriving at Mexican points of diversion or at the Southerly International Border between the two countries. Treaty Between the United States of America & Mexico, Art. 10(b), 15(e), AR BOR Part I at I–30. Mexico then built and completed in 1950 the Morelos Dam near the intersecting boundaries of Arizona, California, and Baja California to divert its water for use in the Mexicali and San Luis Valleys.[2]

A few years later, Arizona filed suit to resolve continuing disputes over the apportionment of water among the lower basin states. After a decade of litigation, the Supreme Court held that the Secretary of the Interior is bound by the Colorado River Compact, *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), and enjoined the federal government from releasing water (other than that needed to satisfy the Mexican Treaty) except in accordance with the order of priority established by Congress: (1) river regulation, improvement of navigation, and flood control; (2) irrigation and domestic uses; and (3) power. *Arizona v. California,* 376 U.S. 340, 341–42, 84 S.Ct. 755, 11 L.Ed.2d 757 (1964). The injunction also affirmed the statutory apportionment of mainstream waters among the three lower basin states. *Id.*

The Bureau of Reclamation, which built and/or operates all of the American dams in the lower basin and serves as custodian of the river for the Secretary of the Interior, is responsible for delivering water to the lower basin states and to Mexico in accordance with the Compact, the Treaty, the Supreme Court injunction, and contracts with recipients. After all those obligations are fulfilled, little if any water actually reaches the Gulf of California in a normal year. River flows generally reach the delta only in years of flooding, although, in the 1980's, even those sporadic amounts helped to restore significant habitat.

## II. Reclamation's endangered species consultation

### A. Initial consultation—from 1995 to 1997

Section 7(a)(2) of the Endangered Species Act directs federal agencies to consult

---

2. Mexico's water is to be supplied first from any surplus beyond the states' 15 million acre-feet allocation and equally from the upper and lower basin portions. AR BOR Part I at 4. AR BOR Part I at 10. The treaty requires that 1.36 million acre-feet be delivered to the Northern International Border, the point where the Colorado first reaches Mexico and where Arizona, California, and Baja California, Mexico meet. The remaining amount of water is delivered approximately 24 miles further down river in Mexico at the Southerly International Border, where it is diverted to the San Luis Valley. Lopezgamez Decl. at ¶¶ 6–8; AR BOR Part I at 10.

with the Secretary of the Interior to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated] critical habitat." 16 U.S.C. § 1536(a)(2).[3] Reclamation began consulting with FWS on new projects in the early 1980s, AR FWS F–316, at 120–22 (listing prior consultations). Until 1995, however, it had never evaluated the impacts of its routine, ongoing operations on listed species and critical habitats along the lower Colorado. In that year, Reclamation began an evaluation of its ongoing operations and initiated negotiations with the three lower basin states and other interested parties over a comprehensive, long-term Multi–Species Conservation Plan (MSCP). AR FWS F–316 at 157.

Regulations issued under § 7(a)(2) require consultations for "all actions in which there is discretionary Federal involvement or control," 50 C.F.R. § 402.03, and govern the consultation process. The consulting agency first prepares a Biological Assessment to evaluate the effects of its action on listed species in the "action area," which is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.* § 402.02. If the agency concludes that a listed species may be affected by its action, it must then formally consult with FWS (for land species) or NMFS (for marine species). 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. The appropriate service (FWS or NMFS) must then issue its own Biological Opinion as to whether the action is likely to jeopardize the species

and, if so, propose "reasonable and prudent alternatives" to the agency's proposal. 16 U.S.C. § 1536(b)(3)(A). If no such alternatives are available, or if the agency rejects the recommendation of FWS or NMFS, the agency must obtain an exemption from a cabinet-level Endangered Species Committee to proceed with its original plan. *Id.* § 1536(e)(3), (g).

Reclamation initially defined the action area for its lower Colorado River operations as extending from Lake Mead to the Southerly International Border. It then analyzed the effect of its operations on protected species within that action area over the next five years, or until the MSCP was adopted, whichever came first. Description of Operations, Maintenance, and Sensitive Species of the Lower Colorado River at 11 (Dec.1995), AR FWS S–8. In response to the draft Biological Assessment, however, FWS directed Reclamation to analyze impacts on *Mexican* populations of the Yuma Clapper Rail, the Southwestern Willow Flycatcher, and the Desert Pupfish, and to seek consultation with NMFS with regard to two marine species in the Gulf of California—the Totoaba Bass and Vaquita Harbor Porpoise—because they were found "in Mexico within the project area or ... within the area of effects from the action under consultation." AR BOR Part III Sec. 2; *see also* AR BOR Part III Sec. 14 at 5 (requesting further analysis concerning Mexican species).

Complying with the FWS directive, Reclamation's Final Biological Assessment analyzed the effects of its operations and maintenance activities on endangered and threatened species in both the United States and parts of Mexico. Final Biologi-

---

3. An endangered species is one that has been determined by FWS or NMFS to be "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C.

§ 1532(6). A threatened species is one that is deemed likely to become endangered "within the foreseeable future." § 1532(20).

cal Assessment (Aug.1996), AR FWS S–13 at 9–11, 191–95. Reclamation described its discretionary operations and its nondiscretionary operations, *id.* at 72–75, and found that its discretionary operations would have no effect on the Vaquita Harbor Porpoise and Desert Pupfish, and that the Yuma Clapper Rail[4] was not likely to be adversely affected. *Id.* at 191–95. Among the species that Reclamation concluded might be affected by its discretionary operations were the Totoaba Bass and Southwestern Willow Flycatcher, the former of which was classified as endemic to Mexico and the latter classified as a migrant species. *Id.* at 122, 195. Reclamation requested formal consultation for the Flycatcher. As for the Totoaba Bass, however, Reclamation concluded that no formal consultation was required because, lacking any discretion over water deliveries to or within Mexico, Reclamation had virtually no ability to reverse conditions in the Colorado River delta. *Id.* at 198.[5]

FWS and NMFS then made their own determinations. NMFS concluded that the Vaquita Harbor Porpoise was not likely to be adversely affected by Reclamation's lower Colorado River operations, AR BOR Part III Sec. 18 at 1–3; AR BOR Part III Sec. 23 at 1,[6] and that no formal consultation was required on the Totoaba Bass, because "the United States, and therefore Reclamation, has no authority or discretion over the flow of water to the Colorado River delta as a result of the Mexican Water Treaty of 1944 and the

1964 Supreme Court decision that enjoined Reclamation from releasing excess water to Mexico beyond that called for in the Treaty." AR BOR Part III Sec. 23 at 1–2. FWS wrote a Biological Opinion on the non-marine species, concluding that Reclamation's operations within the next five years could jeopardize, among other species, the Southwestern Willow Flycatcher, but not the Yuma Clapper Rail. Final Biological Opinion (Apr.1997), AR FWS at F–316 at 151; Apr. 30, 1997 FWS Mem. to BOR, AR FWS at F–316. It found that the risk to the Southwestern Willow Flycatcher was not in Mexico, but in the United States, because of Reclamation's plans to flood 1,000 acres of habitat at Lake Mead. AR FWS F–316 at 140–41. FWS's final recommendation was that Reclamation purchase 1,400 acres of replacement habitat for the Flycatcher. *Id.* at 160.

### B. Reinitiated consultation in 2002

Plaintiffs Defenders of Wildlife and Southwest Center for Biological Diversity have been actively involved in Reclamation's endangered species consultation and in the negotiations over the Multi–Species Conservation Plan (MSCP) from very early in the process. Both groups accepted positions on the MSCP steering committee, both threatened to sue Reclamation in March 1996 if it did not formalize its consultation FWS, and both submitted numerous comments on the various agencies' draft documents. The Southwest Center also sued in Arizona to halt the plans to

---

4. Only the Yuma Clapper Rail in the United States is listed as an endangered species but Reclamation considered the population of this species that exists in Mexico. *Id.* at 162–201.

5. Reclamation also noted that a separate consultation would be conducted through the International Boundary and Water Commission with regard to certain Yuma Clapper Rails that might be affected by future operations of the Yuma Desalination Plant. *Id.* at 166.

6. NMFS actually announced this conclusion shortly before Reclamation released its final Biological Assessment. Although NMFS never explained its conclusion, Reclamation indicated that scientific data on the Vaquita Harbor Porpoise is extremely limited and implied that it is primarily threatened by commercial fishing nets in the Gulf of California rather than the quality or quantity of water issuing from the Colorado River delta. *Id.* at 194–95.

flood the Southwestern Willow Flycatcher habitat along Lake Mead and amended its complaint to challenge the FWS's reasonable and prudent alternative recommendations after the issuance of the final Biological Opinion in April 1997, but lost the case. *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*, 6 F.Supp.2d 1119 (D.Ariz.1997), *aff'd*, 143 F.3d 515 (9th Cir.1998).

Except for their challenge to the replacement habitat for the Flycatcher, the Southwest Center and Defenders of Wildlife waited nearly three years after the issuance of the Final Biological Opinion before bringing this suit. Plaintiffs say that they attempted to have the Multi-Species Conservation Plan address Mexican species, but, after other participants rejected their efforts, they resigned their positions on the MSCP steering committee. After Reclamation rejected their efforts to secure some other form of commitment to address Mexican species, they began recruiting other plaintiffs to join them in this lawsuit. Snape Declaration, ¶¶ 14–28; Hogan Declaration ¶¶ 13–29. They gave formal notice of their intent to sue and filed this action in June 2000.

In May 2002, Reclamation informed the Court that it had reinitiated consultation with FWS concerning its lower Colorado River operations and maintenance activities through April 30, 2005, or until the MSCP is completed. Based on updated wildlife studies and on some of the positive effects of Reclamation's conservation efforts, FWS's supplemental Biological Opinion concluded that its operations are not likely to jeopardize the continued existence of the Southwestern Willow Flycatcher or Yuma Clapper Rail (among other species not in dispute in this case). Def.'s Not. of Reinitiation and Completion of Consultation, Ex. 2, Biological Opinion (April 30, 2002) at 23. The supplemental Biological Assessment issued by Reclamation incorporates the same distinctions between discretionary and nondiscretionary activities and covers the same ongoing Colorado River operations save for new conservation actions and the Yuma Desalting Plant, which is not expected to become operational by April 2005. Def.'s Not. of Reinitiation and Completion of Consultation, Ex. 1, Biological Assessment (March 26, 2002). Neither Reclamation's supplemental Biological Assessment nor FWS's Biological Opinion systematically discusses the effects on all of the Mexican species that were covered in the previous round of consultation from 1995 to 1997.

### Analysis

Contrary to the plaintiffs' assertion that the defendants did not consider protected species in the delta,[7] the agencies did analyze the effects on the Totoaba Bass, Vaquita, Desert Pupfish (species found in Mexico), and on the Yuma Clapper Rail (found both in the United States and Mexico) in the consultation that led to the 1996 Biological Assessment and Biological Opinion, *see supra* pp. 59–60. However, the analysis with respect to all of these species was not supplemented in Reclamation's reinitiated consultation with FWS in April 2002, except for the Southwestern Willow Flycatcher and Yuma Clapper Rail, and both the reinitiated consultation and the previous one in 1995–1997 defined the action area for analysis as Lake Mead to the Southerly International Border and examined the effects on species primarily in the parts of Mexico that received river flows subject to Reclamation's discretionary control. Thus, the issue presented here is

---

7. Specifically, the Totoaba Bass, Desert Pupfish, Vaquita Harbor Porpoise, Yuma Clapper Rail.

whether Reclamation's duty of consultation under the ESA extends to operations affecting extra-territorial species in parts of the delta that are downstream from river flows over which Reclamation has no discretionary control.

Before the merits of plaintiffs' claims are considered, several threshold issues concerning standing, res judicata, and mootness must be addressed.

## I. Standing

 An organization may sue on behalf of its members (i) where at least one member would have standing to sue in his or her own right, (ii) where the interests the association seeks to protect are germane to its purpose, and (iii) where neither the claim nor the remedy requires the members to participate individually. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342–43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The latter two elements are not in dispute here, but defendants argue that plaintiffs have failed to demonstrate that any of their members satisfy the elements of constitutional standing: injury in fact, causation, and redressability. At the summary judgment stage, plaintiffs may not merely allege their standing to sue, but they must support their claims with affidavits or other evidence of specific facts. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C.Cir. 2002).

## A. Injury in fact

To demonstrate injury in fact, a plaintiff must show the invasion of a legally protected interest which is concrete and particularized, and actual or imminent, rather than conjectural or hypothetical.

*Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. In Endangered Species Act cases, "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing," but a plaintiff must demonstrate that listed species are in fact threatened by federal actions and that he will be directly affected aside from his general interest in the subject matter. *Id.* at 562–63, 112 S.Ct. 2130.

As for the threat to listed species, the defendants themselves acknowledge that reductions in the flow and changes in the water quality of the Colorado River have been identified as "primary factors" contributing to declines of the Totoaba Bass, because the Totoaba spawn at the mouth of the river, AR S–13 at 196–97, and that the river flows have "actual and potential" impacts on the Vaquita Harbor Porpoise through changes in habitat, food webs, and biological diversity, although data is quite limited on that species, *id.* at 195. Water diversion and flood control measures have destroyed habitat for the Southwestern Willow Flycatcher and the Yuma Clapper Rail and, perhaps even more importantly, have impeded the dynamic process of habitat creation through flooding and channel shifting. AR FWS F–316 at 67, 143–45, 147. As side pools have been eliminated, Desert Pupfish have also been forced into mainstream channels, where they have difficulty competing with other species and predators. Determination of Endangered Status and Critical Habitat for the Desert Pupfish, 51 Fed. Reg. 10842, 10847 (March 31, 1986)(codified at 50 C.F.R. pt. 17).

Plaintiffs have demonstrated that these impacts on the species in question have a direct effect on their aesthetic, scientific, recreational, and economic interests.[8] Un-

8. Plaintiffs also assert that they have been

injured by the defendants' failure to release

like the complainants in *Lujan*, who had only vague plans to return "some day" to observe endangered species in countries that they had visited once before, *Lujan*, 504 U.S. at 564, 112 S.Ct. 2130, members of three of the Mexican groups have lived in the delta region for decades, Gonzalez Decl. at 1; Gallegos Decl. at 1, or work there on an ongoing basis with indigenous peoples, Nachón Decl. at 2.[9] Members of the four American groups state that they have visited the region repeatedly and aver that they will be returning there within a period of months or a few years for study, work, and recreation. Snape Decl. at 2; Hogan Decl. at 1–2; McCarthy Decl. at 1–2; Force Decl. at 1–2. The declarants also state specifically that their ability to observe and photograph wildlife as a form of recreation, participate in scientific studies and educational tours, and hunt and fish have been curtailed by the effect of Reclamation's operations as the species in question continue to decline. Snape Decl. at 2; Hogan Decl. at 2–3; McCarthy Decl. at 1–2; Force Decl. at 1–2; Gonzalez Decl. at 2; Nachón Decl. at 2; Gallegos Decl. at 2; *see also* Gonzalez Decl. at 1–2 (water and wildlife conditions have also hampered declarant's ecotourism business opportunities).

Contrary to defendants' assertions, these declarations are sufficiently detailed at the summary judgment stage to show that the members of the plaintiff organizations have suffered an injury in fact to a particularized interest. They have experienced the effects of Reclamation's operations in a "personal and individual way by seeing with [their] own eyes the particular animals whose condition [and declining populations] caused [them] aesthetic injury." *Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 432–38 (D.C.Cir. 1998)(en banc). Like the plaintiffs in *Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221, 231 n. 4, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), their wildlife watching and studying activities have been adversely affected by the continuing decline of the five species' populations in the delta, particularly as some of those species approach the point of extinction. *See also Lujan*, 504 U.S. at 566–67, 112 S.Ct. 2130 (noting that people who observe or work with particular species in an area in which they are threatened might face perceptible harm from the fact that those animals may die out).

## B. Causation

To demonstrate causation, the plaintiffs must show that their injuries are "fairly traceable" to the challenged action of the defendants rather than being the result of independent action by a third party not before the Court. *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. In a procedural violation case, in this Circuit, an adequate causation chain must contain at least two links: one connecting the disputed procedure to a substantive government decision that may have been wrongly de-

---

information on the impacts of Reclamation's operations on Mexican species as part of the consultation process. However, such injuries have only been recognized in "very specific statutory contexts" where a statute has "explicitly created a right to information." *Animal Legal Defense Fund, Inc. v. Espy*, 23 F.3d 496, 501–04 (D.C.Cir.1994). The D.C. Circuit has been particularly skeptical of environmental organizations' standing to bring such claims. *See, e.g., Florida Audubon Society v.*

*Bentsen*, 94 F.3d 658, 674 n. 2 (D.C.Cir. 1996)(en banc)(Rogers, J., dissenting); *Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 84 (D.C.Cir.1991).

9. A fourth, Centro Regional de Estudios Ambientales y Socioeconomicos, A.C., has not presented any evidence concerning its standing in response to the defendants' challenge. It will be dismissed from the case.

cided because of the procedural violation, and another connecting the substantive government decision to the plaintiff's particularized injuries. *Florida Audubon Society v. Bentsen,* 94 F.3d 658, 668 (D.C.Cir. 1996)(en banc). Thus, a plaintiff has not established standing unless there is a "substantial probability that the substantive agency action that disregarded a procedural requirement created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiff." *Id.* at 669.

■ In this case, there is no serious question that Reclamation's ongoing operations on the lower Colorado River have had and will continue to have a significant impact on the delta region and the species in question. *See supra* pp. 62–63. Reclamation's argument that water diversions and various other activities affecting water delivery to Mexico are nondiscretionary goes to the merits of the proper scope of consultation under the Endangered Species Act, not the basic question of whether the plaintiffs' injuries are fairly traceable to Reclamation's actions. *See, e.g., City of Waukesha v. EPA,* 320 F.3d 228, 235–36 (D.C.Cir.2003)(in reviewing standing question, court must be careful not to decide questions on the merits); *Sierra Club v. Glickman,* 156 F.3d 606, 616 n. 5, 619 (5th Cir.1998)(treating scope of agency's authority and duty to consult under § 7(a)(2) as questions on the merits that are separate from basic standing analysis); *Strahan v. Linnon,* 967 F.Supp. 581, 615–18, 620–22 (D.Mass.1997)(analyzing standing separately from agency defense that ESA did not require consultation on nondiscretionary actions), *aff'd,* 1998 WL 1085817, at *3 (1st Cir.1998)(unpublished); *Florida Key Deer v. Stickney,* 864 F.Supp. 1222, 1224–26, 1239–40 (S.D.Fla.1994)(same).

## C. Redressability

■ Plaintiffs challenging substantive government actions must demonstrate that a favorable court decision would "likely" redress their injuries, but in cases alleging procedural violations, plaintiffs need not show that the government would have reached a different substantive decision if it had followed proper procedures. *Lujan,* 504 U.S. at 561, 572 n. 7, 112 S.Ct. 2130. Invoking this relaxed standard, plaintiffs assert that there is at least a chance that a second, proper consultation would help abate the endangerment to the species by requiring stronger protective measures. Defendants posit that the relaxed redressability standard only applies in cases in which a procedure was entirely omitted, but that argument is contradicted by the D.C. Circuit's opinion in *Florida Audubon Society,* 94 F.3d at 666 (standard applies in cases involving procedural "omission[s] or insufficienc[ies]"), and by common sense. Regardless of whether the government omits a procedural step or merely performs it in an incorrect or inaccurate manner, the ultimate harm is the same: that the agency may have overlooked the creation of a demonstrable risk to plaintiffs' particularized interests because it failed to complete proper procedures. If the plaintiffs can make their case on the merits, it seems "likely" that a second, proper review would correct the procedural error so that the risks to the plaintiffs' particularized interests are properly identified by the government.

Defendants also argue that, even if a reconsultation were somehow to eventually result in larger water releases, the Mexican government would divert such flows for its own purposes. Under the U.S.-Mexico treaty, any additional waters arriving at Mexican points of diversion or the Southerly International Border between

the two countries are the sole property of the Mexican government. AR BOR Part I Sec. 5 (Treaty Art. 10(b), 15(e)). Mexico's physical capacity for storing water and its interest in diverting additional flows are not well documented in the administrative record, but Mexico is an independent sovereign not answerable to this Court. *See Dellums v. U.S. Nuclear Regulatory Comm'n,* 863 F.2d 968, 976–77 (D.C.Cir.1988)(discussing reluctance to recognize standing where the effectiveness of relief depends on the unforeseeable actions of a foreign nation). Apart from the question of what Mexico might do with larger releases, Reclamation's authority to make additional releases might well depend on obtaining approval from the United States Supreme Court, whose continuing injunction requires that any excess waters available for consumptive purposes beyond the 7.5 million allocated by the Colorado River Compact and the 1.5 to 1.7 million allocated to Mexico under the Treaty be allocated by formula to the lower basin states. *Arizona v. California,* 376 U.S. 340, 341–42, 84 S.Ct. 755, 11 L.Ed.2d 757 (1964).

■■■ This argument of defendants does indeed raise serious questions about plaintiffs' case and is, as it turns out, dispositive. The only question is whether the argument defeats plaintiffs' standing to bring this suit, or whether it disposes of the merits of the plaintiffs' claim. It is a very close question. Because a plaintiff need not show that an underlying substantive government action would necessarily

change in order to demonstrate redressability for procedural violations, however, *Lujan,* 504 U.S. at 573–74, 112 S.Ct. 2130; *see also Florida Audubon Society,* 94 F.3d at 674–75 (Rogers, J. dissenting)(*Lujan* held that redressability should not be looked at in procedural cases), I will proceed to the merits upon the arguendo assumption that plaintiffs have satisfied the redressability requirement.

## II. Res judicata

■■■ Under the doctrine of res judicata, the Center for Biological Diversity is precluded from relitigating issues that were or could have been raised in *Southwest Ctr. for Biological Diversity v. U.S. Bureau of Reclamation,* 6 F.Supp.2d 1119 (D.Ariz.1997), *aff'd,* 143 F.3d 515 (9th Cir. 1998)—its previous action against Reclamation and FWS challenging the validity of the consultation on the Southwestern Willow Flycatcher. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Accordingly, the Center cannot proceed against either agency in this action.[10] The doctrine of res judicata does not bar the Center's suit against NMFS, because NMFS was not a party to the prior suit. *Id.*

## III. Mootness

■■■ The defendants briefly suggest that their recent three-year reinitiated consultation "raises serious mootness issues," although they have not presented the mootness issue formally. Regardless of the reinitiated consultation, an actual

---

**10.** The Center argues that the "could have been raised" prong of the doctrine does not apply to its claims relating to the treatment of Mexican species, because, at the time of the earlier litigation, it was participating in a voluntary Multispecies Conservation Plan that it expected to address the Mexican populations. That argument finds no support in cases holding that *post-judgment* events giving

rise to new claims are not barred by res judicata. *See, e.g., Stanton v. District of Columbia Court of Appeals,* 127 F.3d 72, 78 (D.C.Cir.1997). There were no events after the Arizona litigation that gave rise to new claims. The Center's consultation claim about other species in Mexico could have been presented in the previous case.

controversy remains as to the application of the Endangered Species Act to nondiscretionary agency actions within the United States that have extraterritorial effects. The reinitiated consultation, indeed, preserves and sharpens the controversy, since Reclamation has not changed its definition of the "action area" nor expanded its analysis of endangered and threatened species in Mexico.

### IV. Endangered Species Act Consultation

 Under § 7(a)(2) of the Endangered Species Act:

*Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency* (hereinafter in this section referred to as an "agency action") *is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species* which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section . . . .

16 U.S.C. § 1536(a)(2)(emphasis added). There is a general presumption against extraterritorial application of American statutes in the absence of an "affirmative intention of the Congress clearly expressed" to extend their scope to extraterritorial conduct, *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991); *Foley Bros. v. Filardo*, 336 U.S. 281, 284–85, 69 S.Ct. 575, 93 L.Ed. 680 (1949). The presumption is inapplicable, however, to federal agency actions within the United States that have extraterritorial effects:

By definition, an extraterritorial application of a statute involves the regulation of conduct beyond U.S. borders. Even where the significant effects of the regulated conduct are felt outside U.S. borders, the statute itself does not present a problem of extraterritoriality, so long as the conduct which Congress seeks to regulate occurs largely within the United States.

*Environmental Defense Fund v. Massey*, 986 F.2d 528, 531 (D.C.Cir.1993); *see also Gushi Bros. Co. v. Bank of Guam*, 28 F.3d 1535, 1538 (9th Cir.1994)("Questions involving the reach of Congress' prescriptive jurisdiction are not implicated when the conduct sought to be regulated occurs inside the United States."). Defendants present no substantive argument to the contrary.

Defendants argue, however—making the same argument on the merits that they made in support of their motion to dismiss for lack of standing—that, even if Reclamation's actions have extraterritorial effects on the protected species in the delta, the consultation requirements of Section 7(a)(2) have no application to non-discretionary actions. Under 50 C.F.R. § 402.03, a facially valid regulation that plaintiffs are in no position to challenge,[11]

---

**11.** Plaintiffs have not attempted a facial challenge to this regulation as inconsistent with the text of the Endangered Species Act, perhaps because they realize that they may well be procedurally barred from doing so. The regulation was promulgated in 1986, so such a challenge would appear untimely under the general six-year statute of limitations applica-ble to suits against the United States. 28 U.S.C. § 2401(a); *Kennecott Utah Copper Corp. v. United States Dep't of Interior*, 88 F.3d 1191, 1213–14 (D.C.Cir.1996)(stating that the appropriate way to challenge a longstanding regulation as violative of a statute is to file a petition for amendment or rescission and then challenge the denial of that petition); *see*

"Section 7 [of the ESA] and the requirements of this Part apply to all actions in which there is *discretionary* Federal involvement or control." (Emphasis added). No other court in this Circuit appears to have ruled on the question of whether 50 C.F.R. § 402.03 limits the Section 7(a)(2) consultation duty. Other Circuits have found a limitation upon an agency's duty of consultation when the agency has no control of a third party's action that may threaten a protected species, either because of a contract between the government and the third party that leaves no discretion for the agency to protect the listed species, or because of other statutes or regulations that narrowly define what the agency can do with respect to a particular action. *Sierra Club v. Babbitt,* 65 F.3d 1502, 1509–11 (9th Cir.1995)(consultation not required for Reclamation's approval of logging road project because right-of-way agreement with timber company left no discretion to deny permit to protect endangered species); *Strahan v. Linnon,* 967 F.Supp. 581, 607–08 (D.Mass. 1997)(Coast Guard's issuance of Certifications of Documentation and Inspection to vessels, which is based on strict statutory criteria leaving no discretion to protect endangered species, does not trigger § 7(a)(2) consultation requirement), *aff'd,* 1998 WL 1085817, at *3 (1st Cir.1998)(unpublished); *Ctr. for Biological Diversity v. Nat'l Marine Fisheries Service,* C–01–1706, 2001 WL 1602707, at **1, 2 (N.D.Cal.2001)(unpublished) (agency not required to consult because issuance of permits to fishing vessels was ministerial function under High Seas Fishing Compliance Act leaving no room to deny permits to protect endangered species). *But see Florida Key Deer v. Stickney,* 864 F.Supp. 1222, 1238 (S.D.Fla.1994)(50 C.F.R.

§ 402.03 is not an express or implied exemption in the ESA for "non-discretionary involvement or control."). In *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 173, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the famous snail darter case, the Supreme Court held that the construction of a dam, even if it was well under way prior to the passage of § 7(a)(2), triggered the duty to consult because § 7(a)(2) "admits of no exception," aside from the "hardship exemptions" specified in statute. That holding somewhat counsels against construing 50 C.F.R. § 402.03 to limit the defendants' duty to consult on agency actions affecting species in the delta, but the Supreme Court was not considering a situation in which an agency has no discretionary control over a proposed action, and 50 C.F.R. § 402.03 did not exist when the Court ruled.

■ Plaintiffs urge that characterizing the dispute in terms of "discretionary" and "nondiscretionary" is, at this point, only theory, and that the agency should not be heard to argue that it lacks discretion until it has commenced consultation and actually determined whether there are "reasonable and prudent alternatives" to the proposed agency action. Plaintiffs insist that, as long as there are measures that can be taken to protect the endangered species, such as the acquisition of substitute habitat, Reclamation retains discretion in its management of the lower Colorado River. That argument, however, is itself merely theoretical. Substitute habitat is obviously not an alternative for the Totoaba Bass. The record contains no suggestion of a way, with or without consultation, for Reclamation to ensure that more water reaches the listed species in the delta. The formulas established by the Law of the

---

*also Strahan v. Linnon,* 967 F.Supp. 581, 607–08 (D.Mass.1997)(dismissing facial challenge to § 402.03 on timeliness grounds), *aff'd,*

1998 WL 1085817, at *3 (1st Cir.1998)(unpublished).

River strictly limit Reclamation's authority to release additional waters to Mexico, and Section 7(a)(2) of the ESA does not loosen those limitations or expand Reclamation's authority. *Arizona v. California,* 376 U.S. 340, 341–42, 84 S.Ct. 755, 11 L.Ed.2d 757 (1964). *See generally Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC,* 962 F.2d 27, 33–34 (D.C.Cir.1992)("[Section 7] directs agencies to 'utilize their authorities' to carry out the ESA's objectives; it does not *expand* the powers conferred on an agency . . . .")(emphasis in original).[12] Plaintiffs do not suggest that Reclamation has any control over water after it reaches Mexican points of diversion.

Plaintiffs' final suggestion is that Reclamation retains some discretionary ability to handle "river regulation, improvement of navigation, and flood control"[13] in a way that indirectly releases excess water to Mexico. After a review of the parties' recent supplemental memoranda, that suggestion must be rejected. Reclamation does not have the discretion to manipulate water delivery in the United States in order to create excess releases for the delta. Plaintiffs characterize Reclamation's recent decision to grant "additional deliveries of water" requested by three agricultural districts in California as proof of the agency's discretion over the release of lower Colorado River waters. Reclamation's water deliveries in California do not have any bearing on whether the agency can release more water *to Mexico,* however. The water in question, moreover, was not surplus or a bonus to the agricultural districts. The deliveries had a string attached—a statement of intent to seek "repayment" through reduced diversions of water in the future if it turned out, after Reclamation completed its yearly accounting of water diversions and return flows, that the districts had actually received more water than they were due. Defs.' Resp. to Pls.' Notice of Filing at 4–6.

The Secretary of Interior's recent decision to suspend the "excess" water that California has previously received also has no bearing on Reclamation's water releases to Mexico. The Secretary's decision is solely an exercise of discretion with re-

---

12. Plaintiffs' argument that the defendants have violated § 7(a)(1), which requires federal agencies to "in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species," fails for the same reason. While this provision does impose an affirmative duty on federal agencies, it provides agencies significant discretion in shaping their conservation programs. *See, e.g., Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy,* 898 F.2d 1410, 1416–19 (9th Cir. 1990)(§ 7(a)(1) does not require agency to adopt "least burdensome alternative" and provides agency with some discretion in deciding how to fulfill its duty to conserve); *Defenders of Wildlife v. Babbitt,* 130 F.Supp.2d 121, 135 (D.D.C.2001) (declining to find § 7(a)(1) violation where record did not support a finding that defendants had failed entirely to carry out programs for the conservation of the pronghorn); *Nat'l Wildlife Fed'n v. Nat'l Park Serv.,* 669 F.Supp. 384, 387 (D.Wyo.1987)(agencies have discretionary powers in choosing methods of conservation). Moreover, like § 7(a)(2), it does not expand the authority of federal agencies under their enabling acts. *Platte River,* 962 F.2d at 33–34; *see also Sierra Club v. Glickman,* 156 F.3d 606, 616 n. 5 (5th Cir.1998)(duty to consult and conserve is tempered by actual authority of each agency).

13. At oral argument, *see* 10/30/01 Tr. at 13, plaintiffs asserted for the first time that Reclamation and water users such as the amicus parties may be planning changes in flood control measures that will prevent excess flows from reaching the delta in future years, but that concern is not at issue here. Plaintiffs' assertion has not been briefed and there is nothing in the record that such plans have been made or are currently underway.

spect to the total 7.5 million-acre feet of water (4.4 million-acre feet of which is allotted to California) allocated by the Boulder Canyon Project Act to the three lower basin states of Nevada, Arizona, and California. In previous years, when the lower basin states of Nevada and Arizona did not use all of their respective allotments, California received the "surplus," which gave the state more than its share of 4.4 million-acre feet of water. Defs.' Resp. to Pls.' Notice of Filing at 6–7. However, the lower basin states have now started to use more of their allotments, so that less "surplus" water is available for California. *Id.* Reclamation has been pushing California to reduce its use to the 4.4 million-acre feet allotment. This effort, however, does not cast doubt on Reclamation's position that it cannot interpret the Law of the River in a way that will divert or somehow "indirectly result" in excess flows to Mexico.

The parties have not addressed the question of deference to the agency's interpretation of the Law of the River, but at the very least, *Skidmore* deference should be accorded to Reclamation's interpretation of its duties and its scope of discretion in carrying out those duties under the Law of the River. *See United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Acknowledging such deference in this case may give rise to a concern that agencies will increasingly rely on 50 C.F.R. § 402.03 to avoid ESA consultation duties, but it seems unlikely that any case will present facts that more clearly make any agency's actions nondiscretionary than this one: a Supreme Court injunction, an international treaty, federal statutes, and contracts between the government and water users that account for every acre foot of lower Colorado River water.

## Conclusion

For the foregoing reasons, plaintiffs' motion for summary judgment will be denied and defendants' cross-motion for summary judgment will be granted.

## *ORDER*

For the reasons set forth in the accompanying memorandum, plaintiffs' motion for summary judgment [# 58] is **denied** and defendants' cross-motion for summary judgment [# 66] is **granted**.